# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - -x

ACCELERATION BAY, LLC,

        Plaintiff,

v.                    C.A. No. 16-455 (RGA)

TAKE-TWO INTERACTIVE

SOFTWARE, INC., et al.,

        Defendants.

- - - - - - - - - - - - - -x


CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Videotaped deposition of Michael Mitzenmacher, Ph.D.

Boston, Massachusetts

July 27, 2018

9:01 a.m.




Job No.: 710962

Pages: 1 - 266

Reported By: Alan H. Brock, RDR, CRR

Case 1:16-cv-00455-RGA   Document 827-1   Filed 03/06/22   Page 3 of 10 PageID #: 37443
Micronova MRGA Annan menti   827-1   Filed 03/06/22   a   Page 3 of 10   PageID #: 37443
July 27, 2018

Page 54

1  discussed, for any of the -- at any time for any of
2  the games that are at issue in your reports in this
3  case?
4      A.  No, I don't believe so.
5      Q.  So if we could go to Page 63 of your
6  opening report.  Do you see that?
7      A.  Yes.
8      Q.  At the bottom of Page 63 and the top of
9  Page 64 there are some annotations and a screenshot
10 of what appears to be a Grand Theft Auto Online game
11 session.  Is that a fair characterization of what's
12 shown here?
13     MR. FRANKEL:  Hold on, please, before
14 you answer.
15         The reason I asked to hold on, it
16 doesn't look to me like that figure printed
17 properly.  I'm referring to the figure at the bottom
18 of 63.  Is that relevant to what you're going to ask
19 the witness?
20         MR. TOMASULO:  Well, what I think
21 happened is that it didn't come to us properly.  It
22 may have been something that didn't --
23         May I ask a few more questions, and then
24 we'll see if we can get to the bottom of this?
25         MR. FRANKEL:  Sure.  You're representing

Page 55

1  that you endeavored to print this as it came to you,
2  and your understanding is that the copy of the
3  report you were served on had the image like that?
4  Is that correct?
5      MR. TOMASULO:  That is correct.  I'll
6  see if I can pull up my copy and just confirm.
7      That is correct.  The electronic copy --
8  this isn't a printing error.  This would be -- if
9  there's an error, which there certainly appears to
10 be, it would not have been associated with us having
11 a printing problem.
12     MR. FRANKEL:  It's not you, it's us.
13     MR. TOMASULO:  It might not be you.  It
14 might be the Internet.
15     MR. SOMMER:  We'll blame it on Adobe.
16     MR. FRANKEL:  I'm sorry, counsel, just
17 before we go on:  Do you have a copy of Dr.
18 Medvidovic's report?
19     MR. TOMASULO:  Yes, so I have the
20 printout from that, which is better.
21         Can we mark this as the next exhibit,
22 please.
23         (Exhibit 6 marked for identification.)
24     A.  Oh, yeah.  Somehow the red looks as if it's
25 supposed to be overlaid there.

Page 56

1      Q.  Am I correct that Exhibit 6 is what the
2  figure at the bottom of 63 and the top of 64 should
3  look like?
4      A.  That's my recollection.
5      Q.  That there was some kind of an error that
6  has separated the red overlays from the actual
7  screenshot; is that right?
8      A.  Yeah.  Maybe a picture got moved and only
9  one of the pictures got moved and not the overlay in
10 the final printing.
11     Q.  Assuming that Exhibit -- are we correct in
12 assuming that Exhibit 6 is what this is supposed to
13 look like?
14     A.  Let me just do a quick check, but I believe
15 so, or that's my recollection.
16         MR. FRANKEL:  Doctor, you can take your
17 time to confirm that.
18     A.  That looks correct.
19     Q.  So with respect to this figure, this
20 Exhibit 6, what's the intention of what's being
21 depicted here?  That's kind of a crummy question.
22 Let me ask you a different question.
23         Did you create this Figure 6 that's
24 shown in Exhibit 6?
25     A.  I'd say I can't recall.  I know the

Page 57

1  screenshot was not mine.  That came from somewhere.
2  To be honest, I don't think I created the overlay,
3  but I -- I'd say I can't recall.
4      Q.  So the screenshot was not something coming
5  from something you personally observed?
6      MR. FRANKEL:  Objection to form.
7      A.  The screenshot was not something that I
8  personally developed.
9      Q.  Is it possible that this was generated by
10 Dr. Medvidovic?
11     A.  I'd say it's possible, and again, this may
12 have been something that came to me or suggested by
13 counsel as we were working through examples to show
14 or demonstrate.
15     Q.  But to be clear, this isn't a depiction of
16 gameplay that you personally observed.
17     A.  It's not a depiction that I personally
18 played, right, and I didn't observe it in the course
19 of it being played.  This is like a screenshot, and
20 I believe the description at Paragraph 129 of the
21 report describes or discusses the framing of the
22 screenshot and what it represents.
23     Q.  So there's some annotations added to the
24 screenshot; correct?
25     A.  Yes.  That would be the stuff that sort of

Case 1:16-cv-00455-RGA Document 527-1 Filed 03/05/21 Page 4 of 10 PageID #: 37444
Microsoft Corporation v. Acceleration Bay, et al. — Michael Mitzenmacher, Ph.D.
July 27, 2018

Page 58

1  fell off onto the side, for instance.
2      Q.  Can you explain what's originally in the
3  screenshot, as opposed to what was added in the
4  image?
5      A.  What is added to the image is the red lines
6  and arrows and the numbers 1 through 6 and the
7  corresponding boxes.
8      Q.  And then the rest of it is, to your
9  knowledge, an accurate screenshot?
10     A.  Yes.
11     Q.  You say that there are two players, 5 and
12 6, that were not on the screen.  Is that what you're
13 showing by the screen squares with the arrows
14 pointing to them?
15     A.  Yes, and I believe that's also represented
16 in Paragraph 130.
17     Q.  How do you know those players were there?
18     A.  Again, so I think maybe you're missing the
19 point of the picture, and I think this is discussed
20 in Paragraph 131.  You know, this is meant to be an
21 illustration of the four-by-four Deathmatch and how
22 it works.  There are other players, and they exist
23 in the game because it's a four-by-four Deathmatch.
24 You know, their location as shown in Figure 130
25 could be set up to have those locations simply by

Page 59

1  positioning the player.  To be clear, as stated in
2  131, the image is for illustration purposes.
3      Q.  Did you add or direct the addition of
4  Players 5 and 6 to this screenshot?
5      A.  I'm not clear what you're asking.
6      Q.  I think what you're saying -- well, there's
7  a 5 and a 6 with those arrows; correct?
8      A.  Yes.
9      Q.  Were those Players 5 and 6, those green
10 boxes and those red arrows to the boxes of 5 and 6,
11 were those added to this at your direction?
12     A.  It's a -- or, yes, that it matches the
13 explanation that I've provided in Paragraph 129,
14 that Player 5 has a line of sight with Player 2 and
15 two other players not shown in the illustration
16 below.  That's what that arrow to 5 is meant to
17 represent.  Again, that's also depicted in a
18 different form in Paragraph 130.
19     Q.  How do you know this is from a four-on-four
20 Deathmatch?
21     A.  This picture I think is for illustrative
22 purposes.  It's a screenshot we were using to do it.
23 I don't think the intention of this is to say I was
24 playing a four-by-four Deathmatch and this is the
25 setting that arose.  It's to say this is a setting

Page 60

1  that can arise during a four-by-four Deathmatch game
2  under the following conditions that are expressed in
3  129 to 131.
4      Q.  And just to be clear, those conditions
5  aren't something you personally observed which led
6  to this figure; right?
7          MR. FRANKEL:  Objection to form.
8      A.  I did not personally observe this picture,
9  but I've seen the, you know -- in playing the game I
10 have seen situations like this where you can see or
11 not see other players; and similarly in my general
12 viewing of, you know, online videos of people
13 playing the games, this matches my understanding of
14 how the game is played.
15     Q.  Is this something that you tried to
16 recreate from your memory?
17         MR. FRANKEL:  Objection to form.
18     A.  Recreate from my memory?  I mean, again,
19 maybe I'm not clear on the question.  Could you
20 explain what you mean?
21     Q.  Well, you said you played the games.
22     A.  Yes.
23     Q.  So is this some scenario that you recall
24 happening in a game and that you instructed whoever
25 prepared this to recreate it because you remembered

Page 61

1  it?
2      A.  No, I don't think I set it up that way,
3  although I could set it up that way.
4      Q.  Do you recall ever playing in a four-on-
5  four Deathmatch?
6      A.  I believe I've played in a four-on-four
7  Deathmatch.  I'm not sure, but I believe I have.
8      Q.  So how do you know -- what data do you have
9  to show that Players 5 and 6 would be visible to
10 Players 2 and 4 but not 1 and 3?
11     A.  That -- again, so part of it would be just
12 the visibility on the screen.  But in terms of --
13 particularly with Grand Theft Auto, as I referred to
14 in Paragraph 161, this is illustrating the issue of
15 proximity rules for data exchange, which is
16 described both in my report and also in Mr. Conlin's
17 testing report.
18         MR. FRANKEL:  Counsel, just a second:  I
19 believe for clarity of the record that the witness
20 gestured to Paragraph 131, not 161.
21         THE WITNESS:  Oh, did I say 161?  Sorry.
22         MR. FRANKEL:  I believe you did.
23     A.  133.
24         MR. TOMASULO:  Whatever, that's fine.
25     Q.  You did say 161.

Page 62

1    A.  I apologize.
2    Q.  Well, what is the small box at the lower-
3 left part of the screen?
4    A.  This looks like a variety of the maps, so I
5 believe it's showing your visibility box and players
6 outside the visibility box.
7    Q.  Do you know if this is an accurate
8 representation of the screen grab or whether this
9 has been modified?
10    A.  I can't recall for that red box if that was
11 there or added.
12    Q.  What red box are you talking about?
13    A.  The box I believe you're referring to in
14 the left corner.
15        MR. FRANKEL:  Counsel, do you want to
16 have the witness circle it on the exhibit?  Would
17 that be helpful?  Use a different-colored pen or
18 something?
19    Q.  Yeah, I think it's better if you do it --
20        MR. FRANKEL:  Exhibit 6.
21    Q.  Exhibit 6 is bigger.  I'm a little unclear
22 what we're talking about here.
23        MR. FRANKEL:  Whatever it is you want
24 the witness to talk about, why don't we circle that
25 on the exhibit.

Page 63

1    Q.  There's a map -- in the lower left hand
2 there's a box; correct?
3    A.  Yes.
4    Q.  And then in the box there's three blueish
5 figures; correct?
6    A.  Yes.
7    Q.  And then below each of those blueish
8 figures there's some other kind of box as well;
9 correct?
10    A.  It's a bit hard to make out, but there
11 seems to be -- like you're saying there's some
12 little red dot below them?
13    Q.  Something like that.  And then outside the
14 box, on the top, there's two more of those figures,
15 which have both the blue and whatever the red thing
16 is underneath it; right?
17    A.  Yes.
18    Q.  Here's a magnifying glass, if that's of
19 help for either counsel or the witness.
20        MR. FRANKEL:  Counsel, do you want the
21 witness to just maybe annotate Exhibit --
22        MR. TOMASULO:  I have some questions.
23 Let's see if I can do it my way here.
24    Q.  So there's five of these combo boxes of the
25 blue and red; correct?

Page 64

1    A.  Yes.
2    Q.  And do you know what those five boxes are
3 supposed to represent?
4    A.  Not offhand.
5    Q.  And do you know if all -- so there's two
6 boxes that are outside the -- if you -- I'm going
7 to --
8        You see the two boxes that are at the
9 top of the field map?
10    A.  Yes.
11    Q.  And there are two that are outside of
12 there; right?  Do you see that?
13    A.  I believe I know what you're referring to.
14    Q.  So I'm going to circle them on mine, and
15 I'd ask you to do the same.  So I've circled these
16 two.  Do you see?
17    A.  Okay.
18    Q.  You can circle the same two at the top.
19        And do you know why those two that have
20 been circled are outside of this box?
21    A.  I'm not sure.  It may be expressing that
22 they're outside the visibility range.
23    Q.  So do you know if those were added or
24 whether those are part of the screen grab?
25    A.  I am not sure.

Page 65

1    Q.  And in playing the game, did you ever come
2 to see a field-of-view map or something like that,
3 expressed down at the bottom left?
4    A.  Yes, I recall field-of-view maps in the
5 bottom left, but I can't recall the specific shapes
6 or pictures.
7    Q.  So you don't know whether this is an
8 accurate field-of-view map or whether it's been
9 annotated?
10    A.  I would say I would have to go back and
11 check.  I'm not sure.
12    Q.  What would you check?
13    A.  Again, I'd start by asking counsel to find
14 the provenance of the screenshot.
15    Q.  As you sit here now, you just don't know if
16 this is accurate or not; right?
17        MR. FRANKEL:  Objection to form.
18    A.  I guess I'm not clear on what you mean by
19 "is accurate or not."  Accurate in what sense;
20 right?  I mean, like I've explained the image is for
21 illustrative purposes and the context in which one
22 would understand the illustration in Paragraphs 129
23 to 131.
24    Q.  What do you mean, "for illustration
25 purposes"?

Page 66

1    A.  So it was designed to show a situation
2  where you would have a -- in the context of a
3  four-by-four Deathmatch, you would have a data-
4  transfer graph that was 3-regular but not complete.
5    Q.  And so this is to illustrate your testimony
6  as opposed to evidence that it actually happened.
7  Would you say that that's correct?
8        MR. FRANKEL:  Objection to form.
9    A.  Again, I might phrase it differently.  I
10  would say that this would be an instance that would
11  occur in the game and that such occurrences would
12  regularly happen in the game according to this type
13  of setup.
14    Q.  Just to be clear, you didn't make the
15  screen grab; correct?
16    A.  No.
17    Q.  It's not based on any personal observation
18  you made; right?
19    A.  I mean, the specific screen grab, no.  The
20  fact that, again, players could be positioned in
21  this way, I would say that matches my experience in
22  gameplay.
23    Q.  When you did play, did you observe any
24  restrictions on your ability to move around in the
25  Grand Theft Auto Online world?

Page 67

1        MR. FRANKEL:  Objection to form.
2    A.  Define what you mean by "restrictions."
3  There are certain things -- when there are walls in
4  the way, you have to go around them and such like
5  that.
6    Q.  Leaving aside obvious obstructions and
7  things like that, and boundaries, was there anyplace
8  that you couldn't go in the free-roam world?
9    A.  Again, the free-roam world is a design that
10  you can roam around in the context of rules within
11  the gameplay.  There are various rules or settings
12  that you can't walk into walls, you have to go
13  around things.  There are limitations in terms of to
14  get from one point to a further point it would take
15  a -- I suppose it's plausible that you could walk
16  there in a very long time, but you couldn't really
17  reach it unless you had an automobile.
18        I mean, but I guess I find that a vague
19  question.  But the purpose of the open-space
20  gameplay is that you can, you know, go through the
21  areas prescribed by the gameplay.
22    Q.  Assuming this is from a four-on-four
23  Deathmatch, this Figure 6, is it correct that this
24  is shown from the perspective of Player 1, who would
25  be playing the game?

Page 68

1    A.  I believe so.  Well, it's a screen grab
2  taken, and what we're showing or representing is
3  what Figure 1 -- what Player 1, essentially what
4  their field of vision looks like or what their --
5  what is around them.
6    Q.  Is Player 1 playing this game, or is Player
7  2 playing the game?
8        MR. FRANKEL:  Objection, form.
9    Q.  Player 3 or Player 4.
10    A.  They are all in the game.
11    Q.  Well, this would be appearing on
12  somebody's -- being generated by one of their
13  consoles and showing up on one of their monitors;
14  right?
15    A.  I believe that would be one way to get this
16  picture, yeah.
17    Q.  And so is it -- is this screen grab taken
18  from Player 1's simulation?
19    A.  I'm not sure, but I believe so.
20    Q.  And then who would -- let's assume it is.
21  Who would have positioned Players 2, 3, 4, 5, and 6?
22    A.  Who would have positioned?
23    Q.  In other words, why would Player 2, 3, 4,
24  5, and 6 occupy the positions that they're in in the
25  open world, the virtual positions?

Page 69

1    A.  So in the course of gameplay the players
2  will take various positions or locations as they
3  play the game.
4    Q.  So Player 2 would be responsible for Player
5  2's location in the open world.
6    A.  Generally, yes.
7    Q.  And similarly for 3, 4, 5, and 6?
8    A.  Right, generally the players would control
9  their positions, although they could be coordinating
10  or working as a team in various ways.
11    Q.  There's no relay servers shown in Figure 6;
12  right?
13    A.  In Figure 6?  Do you mean Exhibit 6?
14    Q.  Exhibit 6, yes.
15    A.  That is correct.
16    Q.  Why is that?
17    A.  I guess I'm not clear on the question.  I
18  mean, you would never see a relay server in a screen
19  grab in any circumstances, I think.  But I'm not
20  clear on what your question is.
21    Q.  Is this meant to depict -- is this Figure 6
22  meant to depict the network?
23    A.  Exhibit 6 --
24    Q.  Sorry, Exhibit 6.
25    A.  -- is meant to be an illustration of what

Page 166

1      And then there's going to be one park
2 relay server.
3      A. Yes.
4      Q. One park relay server.
5      So we have a total of 41 participants;
6 is that right?
7      A. Yes.
8      Q. And so let's figure out how they're
9 connected. So you say that each participant in the
10 sub-games is going to be directly connected to each
11 of the other nine players in that sub-game; is that
12 right?
13     A. Yes.
14     Q. And then you come to the conclusion that
15 it's a 9-regular network.
16     MR. FRANKEL: Objection to form.
17     A. That subpart is a 9-regular network. It
18 becomes 10-regular when you include the connection
19 to the MyPARK relay server.
20     Q. So each of the player participants has nine
21 connections to other players.
22     A. Yes.
23     Q. And each of the player participants has a
24 connection to the MyPARK server.
25     A. Yes.

Page 167

1      Q. So the MyPARK server has a total of 40
2 connections.
3      A. I believe that's right.
4      Q. So in this configuration the players each
5 have ten connections and the park relay server
6 participant has 40 connections; right?
7      A. I think that's right.
8      Q. And so that's not an m-regular incomplete
9 network; right?
10     MR. FRANKEL: Objection to form.
11     A. So we'd have to go back to, I think, my
12 reply report. But I think that particular
13 configuration is discussed as a DOE equivalent.
14     Q. So it doesn't meet the literal definition
15 of an m-regular incomplete network because the
16 MyPARK server participant has 40 connections and the
17 player participants have 10; correct?
18     A. Give me one sec to check, but....
19     As I recall, that's right, yes.
20     Q. Okay. And if we're talking about a
21 single-game -- well, I think we've already covered
22 that.
23     MR. TOMASULO: How long have we been
24 going since the last break?
25     THE VIDEOGRAPHER: 44 minutes since

Page 168

1 then.
2      MR. FRANKEL: Mike, if you want to take
3 a break, that's fine.
4      MR. TOMASULO: Let's just take five
5 minutes.
6      THE VIDEOGRAPHER: The time is 3:27.
7 We're off the record.
8      (Recess taken.)
9      THE VIDEOGRAPHER: This is the beginning
10 of Media No. 6. We're back on the record. Time is
11 3:44.
12     Q. Let's go to Page 1 of your report.
13     A. Page 1?
14     Q. Yeah, I think that's right.
15     MR. FRANKEL: Counsel, his opening
16 report?
17     MR. TOMASULO: Opening report, correct.
18     Q. So in the summary chart, beginning at Page
19 1, you say that --
20     First of all, what's the Rockstar
21 protocol network?
22     A. I think I use that generally. Rockstar
23 protocol is the protocol designed by Rockstar, and
24 the Rockstar Protocol Network is just sort of a
25 general term describing -- referring to the network

Page 169

1 that arises -- or networks that arise in the course
2 of gameplay on top of the Rockstar protocol.
3      Q. So if a group of players, let's say 30
4 players are playing Grand Theft Auto Online, they
5 will use what you're calling the Rockstar protocol
6 to form the Rockstar protocol network?
7      MR. FRANKEL: Objection to form.
8      A. They conceivably could form a network on
9 top of the Rockstar protocol. I'm not clear that,
10 you know -- again, it's discussed in the specific
11 claim construction what corresponds to the network
12 in different situations, including, I think, some of
13 the examples we've discussed earlier today.
14     Q. Is the Rockstar protocol -- when does -- is
15 the Rockstar protocol network, is that what you're
16 accusing of infringement?
17     A. Again, here, like what the instantiation is
18 of the Rockstar protocol network I think is given in
19 more details with regards to the specific claim
20 elements. Like here I'm just stating it as sort of
21 a general term, referring to the networks formed on
22 top of the Rockstar protocol that correspond to
23 infringing networks. It's not meant to be like
24 here's a single network that infringes. There are
25 different infringing scenarios, I think, discussed

Page 266

```
 1              REPORTER'S CERTIFICATE.

 2       I, Alan H. Brock, Registered Diplomate Reporter

 3   and Certified Realtime Reporter, certify:

 4       That the foregoing proceedings were taken before

 5   me at the time and place therein set forth, at which

 6   time the witness was put under oath by me;

 7       That the testimony of the witness, the questions

 8   propounded, and all objections and statements made

 9   at the time of the examination were recorded

10   stenographically by me and were thereafter

11   transcribed;

12       That a review of the transcript by the deponent

13   was not requested;

14       That the foregoing is a true and correct

15   transcript of my shorthand notes so taken.

16   I further certify that I am not a relative or

17   employee of any attorney of the parties, nor

18   financially interested in the action.

19       I declare under penalty of perjury under the laws

20   of Massachusetts that the foregoing is true and

21   correct.

22       Dated this 30th day of July, 2018.

23

24           Alan H. Brock

25               Alan H. Brock, RDR, CRR
```

Michael Mitzenmacher, Ph.D.   Confidential - Outside Counsel Only
July 27, 2018

1          ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ACCELERATION v. TAKE TWO INTERACTIVE SOFTWARE, INC.

2 Dep. Date: 7-27-18

Deponent:  MICHAEL MITZENMACHER, Ph.D.

3

               CORRECTIONS:

4

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 77 | 16 | deposition-testimony documentation and so on, | deposition testimony, documentation, and so on, | typographical |
| 89 | 8 | send to | sent to | typographical |
| 92 | 2 | foot blancing | load balancing | typographical |
| 157 | 9 | clear reader | clearer read | typographical |
| 164 | 19-20 | such a broad class channel (sic). | such a broadcast channel. | typographical |
| 219 | 11 | we should understood (sic) "computer" generally | we should understand "computer" generally | typographical |
| 220 | 13 | Softwares | Software | typographical |

_____

MICHAEL MITZENMACHER, Ph.D.


Subscribed and sworn to before me this
____day   of _____, 20__.

_____
Notary Public
My Commission Expires:_____

Michael Mitzenmacher, Ph.D.   Confidential - Outside Counsel Only
July 27, 2018

1                  CERTIFICATE OF DEPONENT

2

3        I, the undersigned, declare, under the penalty

4   of perjury, that I have read the foregoing transcript,

5   and I have made any corrections, additions, or deletions

6   as I deemed necessary.   The foregoing is a true and

7   correct transcript of my testimony contained therein.

8

9   Dated: *7/28/18*   Signed at: _LEXINGTON MA_

                                   (City, State)

10

11

12        BY: _____

            MICHAEL MITZENMACHER, Ph.D.

13

14

15

16

17

18

19

20

21

22

23

24

25